# Elizabeth L. Brundred, Appellant, *v.* John B. Smithman.

*Contract—Evidence—Question for jury.*

The Supreme Court will not reverse a judgment on a verdict for the defendant in an action for a breach of an alleged contract to deliver stock of a corporation, where the evidence for the defendant, although contradicted, tended to show that the money paid to him was not for stock, but was paid as a bonus in consideration of his agreeing to sell to the plaintiff other stock which he controlled.

Argued Oct. 26, 1898. Appeal, No. 199, Oct. T., 1898, by plaintiff, from judgment of C. P. Venango Co., Jan. T., 1898,

No. 39, on verdict for defendant. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Assumpsit for an alleged breach of contract. Before CRISWELL, P. J.

The facts appear by the charge of the court which was as follows:

This action is brought by the plaintiff, Mrs. Brundred, against the defendant, Mr. Smithman, to recover, as we understand, damages by reason of the failure of the defendant to deliver to the plaintiff certain stock in the Oil City Street Railway Company, which she alleges she paid the defendant for, and which he has neglected and refused to deliver to her.

It is alleged on the part of the plaintiff that in the month of February, 1892, she made a contract with the defendant by the terms of which, in consideration of $326.92 paid to him, the defendant was to deliver to her twenty shares of the capital stock of the Oil City Street Railway Company, each share being of the par value of $50.00, and the twenty shares being of the par value of $1,000; that the parties entered into this contract upon the further condition that the plaintiff, Mrs. Brundred, would purchase from the defendant, forty additional shares of stock in the same company at its par value of $50.00 per share, or of the total par value of $2,000. She alleges that she paid the $326.92, for which she was to receive the twenty shares of stock in the street railway company, and that thereafter she paid $2,000 for the forty shares at par. The allegation is that she received the forty shares for which she paid the $2,000, but that she has not received the twenty shares for which she paid $326.92, and that the defendant refuses to deliver those shares to her. Therefore, she brings this action to recover damages, as we understand, by reason of his failure to deliver to her those twenty shares of the par value of $50.00 each, and claims that she is entitled to recover as damages the value of those shares at the time they should have been delivered.

It is testified on the part of the plaintiff that demand was made for the twenty shares at different times. There was no demand in writing until December of last year, but she claims that she demanded, through her husband, as agent, the deliv-

ery of these twenty shares at numerous times, and that the defendant refused to deliver them. If this allegation on the part of the plaintiff be correct, if she made such contract with the defendant, and he received her money, she would be entitled to recover the value of those twenty shares not delivered to her at the time she made demand therefor. I do not know that any particular date is mentioned when the demand was made, but it appears that, at the time, there were no certificates printed, and the parties did not contemplate an immediate delivery, so she would not be entitled to recover until such time as she made a demand for the certificates, and he refused to deliver them. This allegation on the part of the plaintiff is supported by the testimony of her husband, Mr. Brundred, who, it appears, represented his wife in these negotiations, and also by the testimony of Mr. Stanley Loomis and Mr. C. F. Hartwell. They all testify, substantially, as we understand, that the contract made with the plaintiff is the same contract made with the other parties associated with her, and that the contract was as alleged by the plaintiff. [Upon cross-examination, Mr. Brundred, and possibly some of the others, were interrogated as to why the price of $326.92 was fixed upon this stock. No reason was given, as I remember, except the fact that that was agreed upon. If that was in fact the contract made between these parties, without any fraud or illegality in it, the plaintiff would be entitled to recover, although the consideration paid at that time was much less than the par value of the stock which she was to receive.] [1]

Now, we have been talking so far, gentlemen, in reference to stock in the Oil City Street Railway Company. In order that you may clearly comprehend the difference between the parties it is important you should distinguish between the Street Railway Company and the Oil City Electric Company, which was another, independent, separate corporation, doing business in Oil City, engaged, as we understand, in the business of furnishing light to the public, and in the further business of furnishing power to the street railway company for the locomotion of its cars. The electric company had entered into a contract with the street railway company, agreeing to furnish the electrical power for propelling the cars.

[The defendant denies he ever made or entered into any such

contract as alleged by the plaintiff.   He says he did not sell her forty shares of the street railway company at par, and he did not agree to deliver her twenty shares of the capital stock of the company for $326.92.   He admits the receipt by him of the $326.92, but he denies that he received the $2,000 for forty shares of stock.   He says that that payment was made to the Oil City Street Railway Company, and in support of his allegation he produces the check, or it has been produced and offered in evidence here, of Mr. Brundred, payable directly to the street railway company for $4,000, it being admitted on all hands that this $4,000 check covered the subscription of Mr. Brundred himself for forty shares and the subscription of his wife for forty shares, the par value of the shares being $4,000.] [2] Mr. Smithman alleges that there was no contract made in February, 1892, but that the inception of the contract under which he received the $326.92 was in January, 1892, and there have been offered in evidence here several communications to which counsel have referred, and which you will have the privilege of examining when you retire, which he says express the contract entered into by him with the plaintiff and the other parties associated with her.

It appears by the evidence that at this time, in January, these two companies had been incorporated, and the Oil City Street Railway Company had commenced the construction of its road within the city, and according to the testimony Mr. Smithman had laid some track and had some two miles of rails on hand, and the construction was then progressing.   He further testifies that he owned a majority of the stock of the street railway company; that other persons were associated with him, a sufficient number, we presume, in order to obtain a charter under the statute, but that the number of shares owned by them was small, and that having subscribed for almost all of the stock himself, he was practically in control of the company.   He alleges that in January, 1892, he received a proposition from certain parties connected with the electric company looking towards a consolidation of the interest of the two companies. He says the first writing that he received was the letter dated January 5, 1892, signed by Mr. Hamilton, Mr. C. F. Hartwell, Mr. B. F. Brundred, Mr. Stanley Loomis, and Mr. C. C. Beggs. This letter, addressed to Mr. Brundred, according to the testi-

mony of Mr. Smithman and possibly that of Mr. Brundred, was submitted to Mr. Smithman, and it therein expressed a willingness on the part of the persons signing the letter to pay Mr. Smithman $10,000 of the stock of the electric company, that is, turn over to him $10,000 of the stock of the electric company, in consideration of the contracts, privileges and franchises of the street railway company. As we understand this letter, it was in brief a proposition to purchase the street railway franchises and Mr. Smithman's interest in the street railway. Mr. Smithman testifies that the charter was obtained in 1889, some three years prior to this time, and that he had been to a great deal of trouble and some expense in obtaining the charter and in securing the right of way within the city, the right to locate the tracks and run the cars, and, as we understand, he felt that he was entitled to something for the services rendered by him along these lines, not represented by the capital stock of the company; that, being the principal stockholder, he felt that he was entitled to some consideration or payment for the services rendered by him, and that in pursuance of some previous negotiations this proposition was made, to give him $10,000 of the electric company's stock, he to turn over the franchises of the street railway company. After the receipt of this letter dated January 5, 1892, Mr. Smithman says that he replied by letter dated January 7, 1892, addressed also to Mr. Brundred, in which he states: " I hereby offer to sell to you or your assigns the franchises of the Oil City Street Railway Company; that is to say, the good will, state charter and city rights, which franchises I hereby agree are valid and in force, and will continue so for the term of the state charter, provided the road is completed by December 1, 1893; the price to be paid for said franchises to be one hundred shares of the stock of the Oil City Electric Company on the basis of thirteen hundred shares issued, or for the sum of its market value, to wit, $8,500, at your option; it being understood that I am to receive at your option either cash or bonds of either company at their market value for moneys already expended of and for construction and expense of said street railway, as per vouchers. And I hereby offer to accept the office of director upon the board of said Oil City Electric Company, if you so request. This offer is good until Saturday night, the 9th inst."

You will observe by the terms of this offer, gentlemen, that he was to be reimbursed for any money expended by him in the construction of the road, and in addition to that he was to receive $8,500 for what he terms the franchises. This paper was evidently prepared by Mr. Smithman. He is not a lawyer. If he had gone to a lawyer who understood the law relative to corporations he probably would not have entered into a personal obligation of this kind, because as an individual he had no power to transfer the franchises of the corporation. The franchises were not vested in him as an individual, but they inhered in the corporation, so that as an individual he could not comply with his contract; but, as we have indicated, owning the major-. ity of the stock, it appears to have been taken for granted that he could do so as an individual. He agreed to do so as an individual, and made this proposition to the stockholders in the electric company, and they accepted it; that is, Mr. Smithman was to transfer the franchises and rights of the street railway company over to these stockholders in the electric company. He was to receive $10,000 of the stock of the electric company, or its equivalent in value, $8,500 in cash, and he was to be reimbursed for any moneys expended by him in constructing the road, and the franchises of the street railway company were to be turned over to the new parties. The letter of January 5, to which I have referred, while it indicates the purpose and intent of the parties, it further indicates that they were uncertain, and did not know just how it could be carried out, as the letter closes in these words: "And provided, further, that a method can be devised whereby said franchises, etc., can be held either directly or in trust for said Oil City Electric Company." This paper of January 7, you will observe, and the acceptance indicates no method of carrying this contract into execution. It simply provides what shall be done, but fails to provide how it shall be done. Mr. Smithman alleges after the acceptance of his proposition that an attorney at Oil City, Mr. Hancock, was consulted in reference to the method of carrying this contract into effect. As we understand, all parties were working together then in harmony, according to his testimony, and they jointly consulted Mr. Hancock as to the method of carrying it into execution. You heard Mr. Hancock's testimony read to you. Mr. Smithman testifies that Mr. Hancock advised them

that the franchises of the Oil City Street Railway Company could only be transferred to these new parties by transferring the stock to them. In other words, that the franchises were inseparable from the stock, and the only way that the new parties, Mr. Brundred, Mr. Hartwell and others, could acquire the franchises of the street railway company and the right to build a street railway in the city of Oil City, was to buy the stock of the street railway company. Mr. Smithman says they were so advised, and Mr. Hancock testifies that he so advised the parties. It is further alleged by the defendant that in pursuance of this advice as to the method of carrying out this contract of January 9, 1892, in order to carry that through according to the intent of the parties, it would have to be done by the stockholders in the electric company subscribing for the stock of the Oil City Street Railway Company; that there could not be, as we remember, a consolidation of the two corporations. That is, that the street railway would have no right to operate the electric plant, and that the electric company would have no right to operate a street railway, the object of their incorporation being different. It further appears, according to the testimony of Mr. Smithman that according to these instructions they agreed upon the plan of creating a unison of interest among the stockholders in the two companies. He says the capital stock of the electric company was $150,000, and that that stock was to be reduced to $90,000, and that the stock of the street railway company, which was $50,000, was to be increased to $90,000, so that the capital stock of each corporation should be $90,000, and that as a part of the plan each one of the stockholders in the electric company was to subscribe for the same amount of capital stock in the street railway company, so that a person owning sixty shares in one company would own sixty shares in the other; or, rather, the shares not being of the same value, a person owning $10,000 worth of stock in the electric company would own $10,000 worth of stock in the street railway company, and the interest of all the stockholders would be the same in each company.

Mr. Smithman says that while he received the $326.92 from Mrs. Brundred, it was not paid for the twenty shares of stock, but that it was paid to him, as we understand, as a bonus for the stock which he controlled in the street railway company ·

that he claimed that the services rendered by him and the value then attaching to the stock was worth $8,500 in cash, and that through his efforts and by reason of his own subscriptions to the stock he then had control of the street railway stock, and that these other parties, by reason of his control, could not secure any stock in it, could not obtain the privilege of subscribing, and could therefore acquire no interest in the stock of that company unless by his consent, and that he proposed on the payment of $8,500 in cash, or $10,000 worth of stock in the electric company, to give them control of the street railway company, by subscribing for the stock at par. He says the $326.92 paid to him by the plaintiff was paid to him as her share of this bonus, which was to be received by him individually. It appears from the evidence that she owned fifty shares of the capital stock of the electric company, and that the total capital stock then issued was $130,000. She therefore owned one twenty-sixth, and if you divide $8,500 by twenty-six you will discover the result is $326.92, so that the figures would appear to sustain the contention of Mr. Smithman as to the manner in which that amount was arrived at. He further says that it was agreed in order to enable these parties to pay him this amount that a dividend should be declared by the Oil City Electric Company, covering an amount sufficient to enable each of the stockholders to pay him their share of this $8,500. It is testified here, too, by some one that such dividend was declared, and that Mrs. Brundred's share of the dividend was $350, and the check of the Oil City Electric Company to Mrs. Brundred has been offered in evidence here. This check was indorsed by her over to Mr. Smithman individually, and that out of the amount of the check he retained $326.92 and gave her a check back for the difference of $23.08.

Now, he says that was the purpose for which that check was turned over to him, the purpose of it being to reimburse him for what he considered his control of the railway company, or what his services, not represented by the capital stock was worth to him. In pursuance of this arrangement, as alleged by Mr. Smithman, the stockholders in the electric company subscribed for stock in the street railway company. The subscription book has been offered in evidence, which shows that among other subscribers was B. F. Brundred, and he says he subscribed

on behalf of himself, as well as his wife, for $6,000 of the capital
stock, or 120 shares.   He says one half of that represented his
interest and one half his wife's.   You will observe, the shares
being of the par value of $50.00 a share, Mrs. Brundred's share
would be $3,000 and Mr. Brundred's would be $3,000.

It appears from the testimony of several of the witnesses
that, in pursuance of this arrangement, the capital stock of
the Oil City Electric Company was reduced from $150,000 to
$90,000; that Mrs. Brundred owned $5,000 of that stock, and,
the stock of each of the stockholders being reduced proportion-
ately; that by that reduction her stock in the electric company
was reduced from $5,000 to $3,000, and that in payment for the
$2,000 of reduction she received the bond of the Oil City Elec-
tric Company for $2,000.   The subscription here, if you believe
the evidence that one half of this $6,000 was subscribed for
Mrs. Brundred, would indicate that she was carrying out the
contract as alleged by Mr. Smithman; that is, that her stock
had been reduced to $3,000, and she was taking $3,000 of the
capital stock of the street railway company.   It further appears,
according to the testimony of Mr. Smithman, that in consum-
mating this change the $2,000 of bonds received by Mrs. Brun-
dred was converted into cash in some method, and the proceeds
thereof furnished the fund of $2,000 paid in by her to the Oil
City Street Railway Company.

Now, gentlemen, these parties agree in reference to these
papers that have been offered in evidence; that is, they agree
they were executed; that the letter of January 5, 1892, was
signed by the several parties; that it was shown to Mr. Smith-
man; that the letter of January 7, 1892, was written by Mr.
Smithman, and delivered to Mr. Brundred or the other parties
associated with him, and there is no question of the acceptance
of that contract at that time.   There is no controversy as to
these papers having been made and executed at the time, nor is
there any controversy that they expressed the agreement of the
parties as entered into at the time.   The defendant alleges that
that contract has never been changed; that the only modifica-
tion in any way made in the contract was made when they came
to carry it into effect, in adopting the method indicated by Mr.
Hancock for carrying it into effect, and that the parties under-
stood at the time they were executing this contract of Janu-

ary 9, 1892. Now, that is the allegation of Mr. Smithman. The allegation of the plaintiff, although admitting the execution of these contracts, these papers, is that they were entirely abandoned, and that a new contract was made in February, 1892, having no reference whatever to these papers. Now, there is where these parties differ. If you believe the evidence on the part of the plaintiff that a contract was made in February, 1892, by the terms of which Mrs. Brundred was to have sixty shares of the capital stock of the street railway company, forty shares at par, and twenty shares for $326.92, and the defendant has failed to keep his contract, the plaintiff is entitled to recover. On the other hand, if you believe the defendant, that this contract was never changed, and that it was carried into effect in the manner indicated by counsel consulted by them as proper, and that this was joined in by the parties, including Mrs. Brundred, by her agent, her husband, then the plaintiff is not entitled to recover. This is a question of fact, gentlemen, to be determined by you. The question is, how do you find the facts? Are the facts as alleged by Mrs. Brundred here? Is that the true state of affairs, or are the facts as alleged by the defendant? There are three witnesses on the part of the plaintiff who testify in reference to the contract. On the part of the defendant you have the testimony of Mr. Smithman himself. You also have the testimony of Mr. Hancock tending to support the testimony of Mr. Smithman. The defendant is further corroborated, to some extent at least, by the papers and writings which have been offered in evidence. They would appear to be in harmony with his contention here, and would sustain his contention on their face. The method of carrying out the contract, if you believe the testimony of Mr. Smithman, was that indicated by Mr. Hancock, and Mr. Hancock says that these papers which have been offered in evidence were present at the time, or one of them at least was present, and it was in reference to that he advised the parties. You will remember what papers were present when they consulted Mr. Hancock.

Now, where facts are in controversy, gentlemen, it is the province of the jury to determine them. It is our duty to instruct you as to law, and it is your duty to find the facts. Ordinarily it is proper to take into consideration the number of witnesses on each side, and yet the number is not controlling.

.To give you the views of the Supreme Court on that question, I will read the opinion of the Supreme Court in a recent case: " The weight of evidence is not a question of mathe-- matics, but depends on its effect in inducing belief. It often happens that one witness standing uncorroborated may tell a story so natural and reasonable in its character, and in a manner so sincere and honest, as to command belief, although several witnesses of equal apparent credibilty may contradict him. The manner and appearance of the witness, the character of his story and its inherent probability may be such as to lead a jury to believe his testimony and accept it as the truth of the trans- action to which it relates. The question for the jury is not on which side are the witnesses most numerous, but what testi- mony do you believe?"

[If you believe the evidence on the part of the plaintiff, the defendant, Mr. Smithman, was to secure the plaintiff sixty shares of paid-up capital stock of the Oil City Street Railway Company, which would carry with it the presumption that he would pay the cash therefor, or had paid the cash therefor, $3,000, and that he would turn over such stock to the plaintiff, Mrs. Brundred, for $2,326.92. In other words, that he would turn over to her stock which cost him $3,000 for $2,326.92, that is, taking all the shares together; counting the forty shares at par and twenty shares for $326.92, would make the whole sixty shares cost the plaintiff $2,326.92; or, taking the whole contract together, he agreed to deliver to Mrs. Brundred paid- up stock of the value of one hundred cents on the dollar at a reduction of twenty-two and one half per cent; that is, he agreed to deliver to her stock at twenty-two and one half below its face value. On the other hand, if you believe the defend- ant, his agreement was that he was to be reimbursed for the amount invested by him in construction. He was to be paid for his services or for the control which he then exercised over this company the sum of $8,500, which was equivalent to a bo- nus of seventeen per cent on the capital stock; that is, count- ing the capital stock at $50,000, or a bonus of nine and one half per cent on the capital stock, counting the increased amount of $90,000.] [3]

Now, it is proper for you to take into consideration all of these matters, the reasonableness of the story, the probabilities

of the case, and determine the questions involved and arrive at
a correct ascertainment of the facts. What was the situation
at that time? Was Mr. Smithman endeavoring to dispose of
his capital stock at a reduction, or was he endeavoring to dis-
pose of it at a profit?

Some question has been raised as to transferring the fran-
chises. As we have indicated to you during the trial, the
franchises can only be transferred by transferring the stock,
and by transferring the stock to the new parties they would
control the franchises. [According to the original letter nothing
is said about Mr. Smithman having any stock in the electric com-
pany. It appears, however, he had some stock in that company,
and according to the arrangement advised by Mr. Hancock he
would retain his interest in the electric company and retain
a like interest in the street railway company. The franchises
of the company would be in the control of the majority of
the stockholders in that company, and if this arrangement
advised by Mr. Hancock was acquiesced in and carried out
by them, if they acquiesced in Mr. Smithman retaining stock,
they would have a right to do so, and if no complaint was
made then, no complaint could be now made in reference to
it.] [4]

It is proper also to call your attention to the statement made
by Mr. Loomis to the effect that a valuable contract had been
entered into by the electric company with Mr. Smithman, and
he gives this as one reason why Mr. Smithman was disposing
of stock below par. That contract has been offered in evidence,
and we will say to you, gentlemen, that although that contract
is made with Mr. Smithman individually, it appears upon its
face that it was made upon behalf of the street railway com-
pany, and that construction which we think it bears is sus-
tained by the paper offered in evidence here, signed by the
various stockholders in the electric company.

Now, the burden rests upon the plaintiff to satisfy you by
the weight of the evidence, the preponderance of proof, that
her contention is correct. Unless she so satisfies you your
verdict should be for the defendant. If the evidence be
equally balanced then her contention must fail, because it is
necessary that the plaintiff have the preponderance of proof
on her side.

If you find for the plaintiff you will find for the value of these twenty shares of stock at the time the same were demanded by her, together with interest from the time of demand up to the present time. If you find for the defendant your verdict will simply be for the defendant.

The plaintiff has asked us to instruct you on certain propositions of law. We will now read to you the requests for instructions and also our answers.

1. The papers bearing date respectively January 7, 1892, and January 9, 1892, put in evidence by the defendant, and marked exhibit "D," together constitute a contract between the defendant, John B. Smithman, personally and individually, to sell to B. F. Brundred and the persons named in the letter of January 5, 1892, or assigns, the franchises of the Oil City Street Railway Company; that is to say, the good-will, state charter and city rights, for the sum of $8,500, and the money expended by him for the construction and expense of the said railway company; that said contract is in no sense a contract for the purchase of stock of the Oil City Street Railway Company; and, there being no evidence that the contract so made was performed or offered to be performed by the defendant or on his behalf, said contract is immaterial in this case. *Answer:* That point is refused. [6]

2. By the purchase of stock of a corporation the purchaser does not acquire the franchises of the corporation, but becomes entitled as stockholder to participate in its profits and in its management. The franchises remain in the corporation. *Answer:* Our answer is this: By the purchase of stock of a corporation the purchaser acquires an interest in the franchises of the corporation, proportioned to the whole in the ratio which his stock bears to the whole stock of the corporation. [7]

3. By the subscription to the stock of the railway company by the persons named as subscribers thereto by the defendant, the franchises of the street railway company were not transferred to the subscribers. *Answer:* Technically this is correct. Subscription for stock is, however, one of the steps toward acquiring ownership of the franchises. As thus qualified, and as further qualified by the general charge, this point is affirmed. [8]

[We will say to you just in conclusion that you must be sat-

isfied by the weight of the evidence that the contract alleged by the plaintiff was in fact made and entered into. If you find that no such contract was made, she is not entitled to recover. We further deem it immaterial whether the first contract made by the parties was fully executed and carried out or not. If you find that the contract alleged by the plaintiff was not entered into she is not entitled to recover.] [5]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* among others were (1–8) above instructions, quoting them.

*J. H. Osmer*, with him *A. R. Osmer*, *N. F. Osmer*, *Wm. M. Parker* and *J. D. Trax*, for appellant.

*Robert F. Glenn*, with him *Peter M. Speer*, for appellee.

PER CURIAM, November 7, 1898 :
The important matters in controversy in this case were pure questions of fact. They were carefully and correctly submitted to the jury by the learned court below, and the verdict disposes of all of them. The offers of testimony were properly ruled. We discover no error in the charge.

Judgment affirmed.